Filed 1/8/15  P. v. Graves CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C075358 |
| Plaintiff and Respondent, | (Super. Ct. No. CM036565) |
| v. | |
| CHARLES BRYAN GRAVES, | |
| Defendant and Appellant. | |

A jury found defendant Charles Bryan Graves guilty of two counts of misappropriation of public funds (Pen. Code,[1] § 424, subd. (a).).  The jury was unable to reach a verdict on an additional charge of misappropriation which was later dismissed.

After denying defendant's motion for a new trial, the trial court suspended imposition of sentence and granted probation for a term of three years subject to certain terms and conditions including 45 days in county jail.  The trial court granted a stay of the jail time pending appeal.

---

[1]     Undesignated statutory references are to the Penal Code.

Defendant appeals. He contends the trial court prejudicially erred in failing to instruct the jury that the offense of misappropriation did not apply to the incidental and minimal use of public resources. (§ 424, subd. (c).) If this contention is deemed forfeited, defendant claims trial counsel rendered ineffective assistance in failing to object. Defendant also contends the trial court prejudicially erred in instructing on the required intent. We affirm.

FACTS

Defendant was superintendent of maintenance operations for the county public works department, had 60 people working under him, and reported to Shawn O'Brien, the assistant director. Defendant negotiated contracts for the removal of dead and/or hazardous trees, trees in the county right-of-way, and trees that were an obstruction. The wood from the trees could be very valuable. When the cost to remove the tree was more than the value of the wood, the county paid the contractor to remove the tree. When the value of the wood was more than the cost of the work performed, the contractor paid the county for the wood. Defendant turned in the money from the sale of a tree to an administrative assistant who would write up a receipt.

In the winter of 2010, Phil Aldred, a foreman at Westgate Hardwoods, removed two trees on the Midway tract and paid defendant $1,000. About the same time, Aldred paid $500 to defendant for wood from the county yard. In the fall of 2011, Aldred removed a tree on Kennedy Avenue and, about three weeks later, paid defendant a total of $5,000, consisting of a $3,500 check made payable to the county, a $1,000 Costco gift card, and a $500 Walmart gift card. Defendant turned in only the $3,500 check to the county, which issued a receipt.

Defendant had a "Cal card," a work credit card, to make purchases for the county. Every year, defendant bought cameras and other items for the county. Defendant wanted to buy a DSLR camera but O'Brien did not think it was appropriate since the county had cameras that were adequate for their work purposes and so advised defendant. Defendant

2

had previously bought a coffee pot and rented a motorized cart, expenses O'Brien thought were extravagant or not necessary. According to O'Brien, defendant had signed off on an encroachment permit for someone he knew after O'Brien had denied the permit. On another occasion, defendant used a county signboard for unauthorized personal use.

Richard West, a district attorney investigator, interviewed defendant on April 30, 2012. Defendant explained that tree removal contracts were both oral and written (anything over $2,500). Initially, defendant denied selling lumber from the county yard to Aldred. Defendant later admitted that he sold some wood from the yard to Aldred for $700 and that the county should have a record of the sale. Defendant admitted selling the Kennedy Avenue tree to Aldred, but claimed the price was $4,500, which included the $1,000 Costco gift card but not the $500 Walmart card. Defendant explained that he used the $1,000 Costco gift card to buy a $831 DSLR (35-millimeter) camera for work so that he could take better photographs of trees that were put out to bid. The camera was in a backpack at home. He planned to use the rest of the money on the Costco card to buy supplies for his crew and did use some for pies for a work Christmas party. He acknowledged that the county was unaware that he had received the Costco card.

West later contacted defendant by phone. Defendant claimed he had found a planner he had lost. Inside the planner, defendant found an envelope with $700 from the sale of wood from the county yard. Defendant gave the envelope with $700 and the camera to West when they later met. Defendant explained that he had purchased a lens for the DSLR camera with his own money and had planned to offset the amount. Defendant explained to West that he needed a better camera to take photos of trees for work. The camera and lens cost more than $1,000. Defendant provided receipts for both. The camera was purchased in December 2011. Defendant said he had not yet used the camera for work. In his investigation, West learned that defendant had purchased another camera for the county on his "Cal card" and logged it into the county system within a few weeks of buying the DSLR camera from Costco. Defendant remembered the Walmart

3

card but claimed he returned it to Aldred, explaining that the tree removal had involved more work than expected. West confirmed that the Walmart card had been issued but not used.

David Ullman, a supervisor of road maintenance who reported to defendant, testified that defendant had discussed buying a DSLR camera so he could photograph his daughter in gymnastics and did not mention needing it for work. After defendant purchased the DSLR camera, Ullman showed defendant how to use the various functions when defendant showed him the photos he had taken with it. Ullman used the DSLR camera defendant had purchased at defendant's request for a work-related training session with the Army Corps of Engineers, achieving photos with greater detail. Ullman stated there were other work cameras that would have been adequate for the photos. He admitted, however, under low light conditions, the work cameras would not deliver the same quality photos as a DSLR camera. When interviewed by West, Ullman explained that he had used his personal DSLR camera on a couple of occasions when there were low light conditions.

Charlie Thao, a systems analyst, logged county cameras into the work computer system. Thao had received other cameras from defendant to log but not the DSLR camera. Thao remembered defendant and Ullman having the DSLR camera in Thao's office and talking about its specifications but defendant did not ask Thao to log it.

Defendant testified. He denied having received any money for the Midway trees, explaining the value of the trees equaled the value of the work done. At the time of the tree removal, defendant had told a county administrative analyst essentially the same thing.

Defendant admitted having sold tree "stumps" from the county yard to Aldred. Defendant had first denied it when West asked because he referred to "lumber" sold from the yard. Defendant received $700 cash, put it in an envelope in his planner, and then in

his county vehicle for safekeeping. He thought he had turned the money in but when it became an issue, he found the money in his old planner.

For the Kennedy Avenue tree, defendant admitted receiving a $1,000 Costco card and a $3,500 check from Aldred but claimed Aldred kept the Walmart card. Defendant claimed Aldred was supposed to settle up with his contractors and notify defendant if there was money left over and to forward it to the county. Defendant testified that he needed a better camera for a large work project he was doing with the Army Corps of Engineers so he negotiated payment to include the $1,000 Costco card to buy the camera with a 28- to 55-millimeter lens, "a cost savings to the county." On his personal credit card, he bought a telephoto zoom lens for the camera in February 2012 while on vacation but had not turned in the receipt for either the camera or the telephoto lens because he had been busy. He claimed that both the camera and telephoto lens were county property and that he planned to seek reimbursement for the difference between the cost for both and the $1,000 Costco card. He had asked for the Walmart card because he needed to purchase safety awards for his workers. He admitted that he initially denied the Walmart card was part of the transaction. About two months after buying the camera, he practiced using it with Ullman and Thao. Defendant did not think to log the camera in at that time. He planned to use the camera for county purposes. He explained that he wanted a video camera for his daughter's gymnastics.

Defendant acknowledged that he was required to know the department's policies. Although he had violated certain policies in the past, he explained that the policy which allowed for personal use of the county's cameras, cell phones, and computers during off hours had not changed as far as he knew. Other policies covered the county's small hand tools and power tools and such policies were informal. He claimed the policy had been unclear at the time he used the county signboard and the next year, after the policy was clarified, he did not use the signboard. He signed off on the encroachment permit but claimed he did not know that O'Brien had already denied the permit. He explained he

5

bought the 100-cup coffee pot which was stored at public works because it was needed for training sessions. Prior to that, he had received permission to borrow a private club's coffee pot which he had to drive miles to pick up and return.

O'Brien claimed a written contract was required for the Kennedy Avenue tree because its value was $5,000. O'Brien admitted that defendant had leeway in negotiating contracts.

DISCUSSION

Defendant contends the trial court prejudicially erred in failing to instruct the jury that the offense of misappropriation did not apply to the incidental and minimal use of public resources and in instructing on the required intent to commit the offense. He also contends that counsel rendered ineffective assistance to the extent his contention concerning incidental/minimal use is deemed forfeited.

The People claim that defendant's failure to object to the instruction on the basis that it omitted reference to incidental and minimal use forfeits his contention on appeal. A defendant's failure to object to instructional error forfeits the contention on appeal unless the defendant's substantial rights are affected. (§ 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.) Nevertheless, we reach the issue because defendant raises ineffective assistance of counsel.

We will reject defendant's contention, finding no evidence to support a defense of incidental and minimal use. We also conclude any error in instructing on the required intent was harmless.

I

*Incidental And Minimal Use Instruction*

To establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that defendant suffered prejudice as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 695-696]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)

6

"It is well settled that a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation]--evidence sufficient for a reasonable jury to find in favor of the defendant [citation]--unless the defense is inconsistent with the defendant's theory of the case [citation]. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . .' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

The information alleged "in violation of Penal Code section 424(a), a Felony, was committed by [defendant], who being a person described in Penal Code section 424 charged with the receipt, safekeeping, transfer, and distribution of public moneys, *did in a manner not incidental and minimal without authority of law,* appropriate the same, and a portion thereof, to personal use and the use of another." (Italics added, bolding omitted.)

Without objection or request for modification (defense counsel stated that the instruction "accurately states the law as laid out"), the trial court instructed the jury on the offense of misappropriation as follows:

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. Defendant is a county officer who was entrusted with the receipt, safekeeping, transfer or distribution of public moneys; and,

"2. Without authority of law, appropriates the same, or any portion thereof, to his own use.

" 'Public moneys' includes all moneys belonging to state, or any city, county or public agency therein."[2]

---

[2]    There is no standard CALCRIM instruction for the offense charged.

7

The court further instructed the jury in the language of CALCRIM No. 251, as modified, as to specific intent as follows:

"The specific intent required for the crime of misappropriation of public funds is that without authority and with the specific intent, appropriates public funds for his own use."

Section 424 provides as follows:

"(a)  Each officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who either:

"1.  Without authority of law, appropriates the same, or any portion thereof, to his or her own use, or to the use of another; . . .

"[¶] . . . [¶]

"Is punishable by imprisonment in the state prison for two, three, or four years, and is disqualified from holding any office in this state.

"[¶] . . . [¶]

"(c)  *This section does not apply to the incidental and minimal use of public resources authorized by Section 8314 of the Government Code*."  (Italics added.)

Government Code section 8314 provides:

"(a)  It is unlawful for any elected state or local officer, including any state or local appointee, employee, or consultant, to use or permit others to use public resources for a campaign activity, or personal or other purposes which are not authorized by law.

"(b)  For purposes of this section:

"(1)  'Personal purpose' means those activities the purpose of which is for personal enjoyment, private gain or advantage, or an outside endeavor not related to state business.  *'Personal purpose' does not include the incidental and minimal use of public resources, such as equipment or office space, for personal purposes, including an occasional telephone call*.

8

"[¶] . . . [¶]

"(3)  'Public resources' means any property or asset owned by the state or any local agency, including, but not limited to, land, buildings, facilities, funds, equipment, supplies, telephones, computers, vehicles, travel, and state-compensated time.

"(4)  'Use' means a use of public resources which is substantial enough to result in a gain or advantage to the user or a loss to the state or any local agency for which a monetary value may be estimated.

"[¶] . . . [¶]

"(e)  *The incidental and minimal use of public resources by an elected state or local officer, including any state or local appointee, employee, or consultant, pursuant to this section shall not be subject to prosecution under Section 424 of the Penal Code*." (Italics added.)

Subdivision (c) of section 424 sets forth a defense since incidental and minimal personal use is not criminalized.  Aldred testified that in the winter of 2010, he paid $500 to defendant for wood from the county yard.  Defendant did not turn the money in to the county.  When initially confronted in April 2012, defendant denied selling any lumber from the county yard to Aldred.  Later, defendant admitted he had done so for $700 and that the county should have a record of the sale.  Later still, defendant claimed he found an old planner with an envelope containing $700 from the sale which he then gave to the investigator.  An example of an incidental and minimal use of public resources is an occasional phone call.  (Gov. Code, § 8314, subd. (b)(1).)  The defense did not apply to defendant's personal use of the $500 (or $700) from the sale of wood from the county yard.

Aldred testified that in the fall of 2011 he paid for the Kennedy Avenue tree with a $3,500 check made payable to the county, a $1,000 Costco gift card, and a $500 Walmart gift card, all of which he gave to defendant.  Defendant turned in only the $3,500 check to the county, keeping the Costco gift card.  Defendant admitted the county was unaware

9

that he had received the $1,000 Costco gift card. In December 2011, defendant bought a camera with most of the money on the gift card. He never logged the camera in as county property. He turned in the receipt only when confronted by the investigator. The camera was located in a backpack at defendant's home. The incidental or minimal use defense does not apply to defendant's personal use of the $1,000 (Costco gift card) obtained from the sale of the Kennedy Avenue tree.

Since defendant did not present evidence to warrant the defense of incidental and minimal use, defense counsel's performance was not deficient in failing to object to the instruction's failure to include such defense and the trial court did not err in failing to instruct on such defense.

II

*Instruction Regarding Intent*

In *Stark v. Superior Court* (2011) 52 Cal.4th 368, our Supreme Court held that section 424, subdivision (a)(1) "requires a broader mental state beyond a mere intent to do the act." (*Stark*, at p. 395.) "Without a mental state as to legal authorization, a defendant could be convicted of violating the section 424 provisions by simply acting or failing to act, even if he was unaware of the facts, as defined by statute, that made his intent wrongful." (*Stark*, at p. 396.) "[T]he People must prove, as a matter of fact, *both* that legal authority was present or absent, *and* that the defendant knew of its presence or absence." (*Stark*, at p. 398.) The People must prove "either actual knowledge or criminal negligence in failing to know the legal requirements underlying the section 424 charges." (*Stark*, at p. 399.)

The instruction given here failed to instruct the jury in accordance with *Stark* on the required mental state. The instruction given instructed the jury that the People were required to prove that defendant acted with the specific intent to act without legal authority rather than that the People were required to prove, as a matter of fact, *both* that

10

legal authority was present or absent, *and* that the defendant knew of its presence or absence.

The People concede that the instruction given here "was technically incorrect under *Stark.*" We conclude that the error in describing the mental state required for a violation of section 424, subdivision (a)(1) was harmless beyond a reasonable doubt.

Defendant admitted that he was required to know the county's policies on use of county property. He admitted that he had not turned in the $500 (or $700) from the sale of wood from the county yard (count 2), offering only that he thought he had turned the money in but only did so when confronted. He knew that he was required to turn in any money received on contracts for the sale of wood. He admitted that the county was unaware of the $1,000 (Costco gift card) which he used to buy a camera. He turned in the receipt only when confronted. The overwhelming evidence reflects that defendant possessed the actual knowledge required by *Stark*. The jury's verdicts on these counts were not attributable to the trial court's omission of instruction on defendant's mental state required for conviction.

## DISPOSITION

The judgment is affirmed.


      ROBIE      , Acting P. J.


We concur:


      DUARTE     , J.


      HOCH     , J.

11